PINCHUK *v.* PINCHUK.

1. HUSBAND AND WIFE—SEPARATE MAINTENANCE—DIVORCE.

Failure of plaintiff to amend her bill of complaint titled "bill for separate maintenance" and asking for alimony and division of property so as to ask for relief by way of separate maintenance was a harmless error where defendant was granted a decree on his cross bill for absolute divorce.

2. DIVORCE—DE NOVO REVIEW.

Since divorce cases are heard *de novo* on appeal, the Supreme Court is not restricted by the findings made below, although especial consideration is given such findings where largely based upon credibility of witnesses and reversal will not be made by reviewing court unless convinced it must have reached a different conclusion had it occupied position of trial court under like circumstances.

3. HUSBAND AND WIFE—SEPARATE MAINTENANCE—DIVORCE—EXTREME CRUELTY.

Record sustained decree denying wife separate maintenance and granting husband absolute divorce on his cross bill on ground of extreme cruelty by reason of continual nagging and accusing him of infidelity.

4. DIVORCE—DOWER—ALIMONY—DISCRETION OF COURT.

An award in lieu of dower and for permanent alimony in divorce cases is so largely in the discretion of the court that it will not be interfered with on appeal except where there is a manifest abuse of that discretion.

5. SAME—DIVISION OF PROPERTY—ALIMONY—DISCRETION OF COURT—COSTS.

Decree granting husband an absolute divorce on his cross bill, which divided $8,000 equity in $13,000 home of the parties equally and awarded wife $1,000 from husband's share therein in lieu of permanent alimony and $15 a week until younger

child reached 17 or completed high school and ordered him to pay $100 to wife's counsel *held*, not an abuse of discretion and is affirmed, without costs.

Appeal from Wayne; Neuenfelt (Lila M.), J. Submitted January 9, 1947. (Docket No. 57, Calendar No. 43,258.) Decided April 17, 1947.

Bill by Minnie Pinchuk against Jack Pinchuk for separate maintenance. Cross bill by defendant against plaintiff for divorce on ground of extreme and repeated cruelty. Decree on cross bill for divorce. Plaintiff appeals. Affirmed.

*Berger, Manason & Kayes,* for plaintiff.

*Davidow & Davidow,* for defendant.

Butzel, J. Minnie Pinchuk, plaintiff, and Jack Pinchuk, defendant, were married in 1920 at Pinsk, Russia. The parties moved to the United States in 1923 and established their home in Detroit. Two daughters are the issue of the marriage, one born in Pinsk in 1921, the other born in Detroit in 1928. The parties ceased living together as husband and wife some time prior to the instant suit. Plaintiff filed a bill for separate maintenance, but the suit was discontinued. Subsequently, in June, 1943, she filed the bill in the instant suit, in which she alleged nonsupport and extreme cruelty on the part of defendant, and asked for alimony and a division of property. Although titled a "Bill for Separate Maintenance," the prayer for relief did not specifically request separate maintenance. The testimony presented, however, was for the purpose of obtaining such maintenance and the trial court suggested that the bill be amended to conform with its general purport. Notwithstanding that plaintiff's counsel

agreed to amend, no such amendment was ever filed. This defect, however, is unimportant in view of the fact that defendant filed an answer and cross bill charging plaintiff with extreme and repeated cruelty and seeking an absolute divorce. After hearing the testimony, the trial court denied plaintiff separate maintenance and granted defendant an absolute divorce on his cross bill. Plaintiff appeals.

Plaintiff testified that the home was a comparatively happy one until, in February, 1940, defendant's refugee sister-in-law, Trudy Pinchuk, and her 12-year-old son, Rene, arrived in this country and took up residence in Detroit. The sister-in-law is the wife of defendant's only brother who at that time was a prisoner in a German concentration camp. The newly-arrived relatives moved into the Pinchuk home and, almost immediately, friction began to develop between the parties herein, to which the children contributed in no small measure. Plaintiff stated that she soon detected a change in defendant's attitude toward her and their children; and that defendant began to neglect his own family while showering attention on the sister-in-law and her son. She further testified that defendant failed to provide adequately for the needs of his own family while contributing generously to the support of the sister-in-law; and that even while being treated for rheumatism of her back and hands she was compelled to take a job in a war plant as a press machine operator in order to. make ends meet. Plaintiff alleges that defendant was guilty of infidelity and testified that one summer when the sister-in-law was vacationing near Tawas, Michigan, the defendant stayed there with her, commuting daily to his business in Detroit.

Defendant testified that his home life was unhappy before his sister-in-law appeared on the scene; that plaintiff was a careless housekeeper;

that he was compelled to wash dishes and scrub floors; that he had to make his own bed and clean his own room; that his clothes were never mended; that he had to do the family shopping; that his meals were irregular; that plaintiff was argumentative and was constantly scolding and nagging; that she repeatedly accused him of infidelity; that she refused to speak to him for months at a time; that she had shown him no wifely attention since 1939; and that he had long since ceased to entertain any love or affection for her but had continued to live at home in order to raise his children until they were able to care for themselves. He stated that he was an electrician by trade and was operating a modest electrical contracting business; that in connection therewith he received telephone calls at his home which his wife either garbled or refused to convey to him. He further stated that he had always supported his family to the best of his ability, had built them a substantial home in an excellent residential district at a cost of $8,700, and had provided them with fine clothes and frequent vacations, while denying such to himself. He complained that his eldest daughter had adopted her mother's attitude and had refused to speak to him for over a year. The daughter testified that she had not spoken to her father for about four years. Defendant emphatically denied that there was anything improper in his relationship with his sister-in-law and stated that he had only accorded her and her minor son the courtesy and consideration owing refugee relatives who were strangers in the country. He admitted having visited his sister-in-law three or four times during the summer that she was vacationing near Tawas, Michigan, where her son was enrolled at a summer camp. He denied having commuted daily between Detroit and Tawas and observed that the distance was 185 miles each way and that it would have been

physically impossible for him to have made the trip daily and attend to his business in Detroit at the same time. Finally he ascribed plaintiff's antagonism toward his refugee relatives as being due largely to the fact that they were converts to a different faith from that of the parties litigant. It would serve no useful purpose to further detail the criminations and recriminations of the parties herein. Suffice it to say that the record indicates that the parties are estranged to a degree that does not admit of much, if any, possibility of reconciliation.

The sister-in-law testified on behalf of defendant. She stated that plaintiff took a personal dislike to her and her son from the very beginning and resented their presence in the Pinchuk home, which she ascribed largely to religious differences; that this attitude was soon adopted by plaintiff's daughters; and that having been treated with undisguised hostility by all the Pinchuks, excepting only defendant, she moved into rented quarters but because of straitened circumstances found it necessary to leave her minor son with the Pinchuk family where he remained for over a year until she was able to provide for him as well as for herself. She further testified that plaintiff was jealous of her personally and not because of defendant's kindness to her and her son; that she had been rebuffed in an attempt to effect a reconciliation between the parties; and that plaintiff was so vindictive toward her as to threaten to make a complaint about her to the immigration authorities and on several occasions had jeopardized her livelihood by contacting her employers and maligning her.

It appears from the record and the opinion of the trial court that the sister-in-law is a person of considerable charm, refinement and ability. She is a college graduate and has studied medicine. Although fluent in five continental languages, she had

no command of English when she arrived in the United States. Despite this handicap, she was able to find employment, maintain herself, master a strange tongue · and acquire 98 credit hours at Wayne University—all of this in a new environment and with a minimum of outside assistance. She had been employed at various times as a governess, librarian and instructor in foreign languages; and at the time of the hearing she had a position with a newspaper. Under her tutelage, her minor son succeeded so well at school as to receive a scholarship to one of the finest private academies in the midwest. Judge Neuenfelt, the trial judge, concluded that the witness was an eminently respectable person. The judge made the following observation:

"The court has quite a number of years of experience on the bench and has seldom met a more intelligent or interesting witness. Although this woman has been in America only since February, 1940, she gave all of her testimony in perfect English with almost no accent; she is a very well educated and charming woman. The court is convinced from the testimony and the attitude of the parties, that the sister-in-law made no effort to cause trouble between the plaintiff and defendant; that apparently, the rift came because she was a woman of such unusual ability."

As usual in this type of case, neither party is entirely blameless. The record, however, is totally devoid of any proof of the existence of an improper relationship between defendant and his sister-in-law. The trial court, having heard the testimony of the parties and of all the witnesses, found that plaintiff was guilty of extreme cruelty in that she "did pursue a course of conduct toward the defendant by continual nagging and accusing him of infidelity, that would make it humanly impossible for any man

to live with her under those conditions." Plaintiff was denied separate maintenance; and defendant was granted an absolute divorce on his cross bill. As stated by this Court in *Chubb* v. *Chubb,* 297 Mich. 501, 506:

"While we are not restricted by the findings of the circuit court, a divorce case on appeal being heard *de novo,* especial consideration is given to such findings, so largely based upon the credibility of the witnesses, and the reviewing court ought not to reverse the determination of the trial court in such a case, unless convinced that it must have reached a different conclusion had it occupied the position of the lower court, under like circumstances. *Brookhouse* v. *Brookhouse,* 286 Mich. 151; *Stratmann* v. *Stratmann,* 287 Mich. 94; *Westgate* v. *Westgate,* 291 Mich. 18."

After a careful review of the record in the instant case, we are not prepared to reverse the determination of the trial court.

The eldest daughter of the parties, who is over 21, testified that she was gainfully employed and could adequately provide for herself. The younger daughter was still attending school at the time of the hearing. Defendant testified that his earnings averaged $50 to $55 per week; that he owned an automobile and an old truck used in his business; that the home of the parties could be sold for approximately $13,000; and that the net equity of the parties in the property is about $8,000.

The trial court decreed that each party has an undivided one-half interest in the equity in the home; that either might purchase the share of the other for the sum of $4000; that in the event that neither party is willing to pay the other for his share, the property should be sold under the order and direction of the court and the net proceeds of the sale be divided between the parties; and that all

payments on the land contract made by defendant pending a final disposition of the property should be credited to him in addition to his share. It was also decreed that defendant pay to plaintiff the sum of $1,000 from his share in the equity in the home in lieu of all permanent alimony for support; that he pay the sum of $15 per week to the friend of the court as permanent alimony for the support of the younger daughter until she reaches 17, or until she completes her high school education should that take longer; and that he pay plaintiff's counsel the sum of $100.

No specific complaint appears to have been made with reference to the division of the household goods ordered by the trial court, or to the ownership of the family automobile which is not mentioned in the decree. Plaintiff contends, however, that the court did not make an equitable division of the property and failed to provide adequate support for her. As stated by this Court in *Tyson* v. *Tyson*, 283 Mich. 192, 194:

"The amount to be awarded in lieu of dower and for permanent alimony rests largely in the discretion of the trial court; and it is only where there is a manifest abuse of that discretion that its award will be interfered with on appeal. *Bialy* v. *Bialy*, 167 Mich. 559 (Ann. Cas. 1913 A, 800)."

Although we might have made a larger award had we been in the position of the trial court, we are unable to find that there has been a manifest abuse of discretion on the part of the trial court.

The award is affirmed, without costs because of the nature of the case.

CARR, C. J., and BUSHNELL, SHARPE, BOYLES, REID, NORTH, and DETHMERS, JJ., concurred.